## Bebout, et al. v. Old Kentucky Manufacturing Company, et al.

(Decided December 7, 1911.)

Appeal from McCracken Circuit Court.

1. Acknowledgment to Deed—When Cannot be Assailed by Parol Testimony.—Where an acknowledgment to a deed is made before a proper officer, his certificate as to when and how it was acknowledged cannot be assailed by parol testimony contradicting it, or that the clerk failed to explain it to the wife.

2. Same—Action to Cancel Deed—Evidence.—In an action to cancel a deed and notes on the ground that their execution was procured by threats of a criminal prosecution, evidence examined and held that the execution of the deed and notes was voluntary and in consideration of a debt owing to the company to which they were executed.

HENDRICK & CRICE for appellants.

WHEELER & HUGHES for appellees.

OPINION OF THE COURT BY JUDGE LASSING—Affirming on original and reversing on cross-appeal.

In May, 1904, there was organized in Paducah a trading corporation known as the Old Kentucky Manufacturing Co. This corporation was organized to deal in proprietary stock foods. The affairs of the company were controlled by a board of directors and a general manager. The directors were H. R. Lindsey, H. C. Overby and Charles R. Allcott. John W. Bebout was a stockholder and the general manager of the company, and to him was entrusted practically the management and control of the company. Under his direction and immediate supervision the affairs of the company were conducted until in May, 1909, when he was called upon by the stockholders and officers to render a detailed statement of the affairs of the company. About that time he was taken sick, and not until June first was the statement as to the condition of the company's affairs rendered by him. In this statement he charged to his personal account about $8,000, $4,200 of which he claimed represented accounts owing by the company for merchandise and supplies which had not been paid or credited by him, and $3,800 thereof was represented as having been added to the merchandise sales account for the purpose of making it

appear; that the company was doing a larger business than it really was. This disclosure of the real condition of the affairs of the company resulted in a meeting between Bebout and the other directors and stockholders, in which he agreed to settle his indebtedness to the company by transfering to it a house and lot owned by him, which he valued at $3,000, and by transferring to the other stockholders all of his stock in the company, to-wit, seventy-five shares, upon which there was an incumbrance of $4,500. This stock was to be taken at a valuation of fifty cents on the dollar, and he was to give to the company his two notes, one for the difference between the value of the stock and the incumbrance on it, amounting to $750, and the other for the difference between his individual indebtedness to the company and the value of the house and lot which he transferred to it, this second note calling for something over $4,600.

In accordance with this arrangement the deed was executed, the notes signed, the stock transferred and delivered, and the matter closed. But after the lapse of a short time he and his wife instituted a suit against the company and its directors above named, in which they sought to have the deed set aside, and the notes cancelled, and the whole transaction nullified, on the ground that, under threats of a criminal prosecution they were forced to convey the property and sign the notes as indicated, and that, in ignorance of the law and his rights, they had yielded to the urgent demands of the directors of the company and conveyed their property and signed the notes solely to avoid a criminal prosecution. They insisted that, while the entries made upon the books by Bebout were irregular, and, as he expressed it, for the purpose of juggling the company's affairs in such a way as that it would appear to be in a prosperous condition and making money, he had in fact done no wrong and had not misappropriated any of the company's money; that his padding of the invoices had the effect only of making it appear that the company had made more money than it in fact had; and that his failure to transfer certain accounts to the suspense account was simply a violation of the instructions which he had received from the directors as to the way in which these accounts should be kept; and that, while he had reported sales in excess of what they really were, the company had not been injured because he had accurately accounted for all monies which he had

received. The company and the directors defended and denied that the transaction between the plaintiffs and themselves was the result of an effort on their part to coerce or enforce him into the execution of the notes and the sale of the house and lot, but stated, rather, that it was the voluntary act of the plaintiff and his wife in an effort on their part to right as far as they could the wrong which the plaintiff, Bebout had done the company.

Proof was taken in support of the respective claims as made by the pleadings, and upon submission the chancellor found in favor of the defendants as to the execution of the deed and the transfer of the stock, but held that the evidence showed that plaintiff and his wife had surrendered the house and lot and the seventy-five shares of stock in settlement of Bebout's indebtedness to the company, and that there was no consideration for tho execution of these two notes. He accordingly directed that they be concelled. From this judgment the plaintiffs have prosecuted an appeal, and the defendants have prosecuted a cross appeal.

Two questions are raised: First, it is insisted that there was no privy examination of the wife in the execution of this deed, and, therefore, she is not bound by its terms; and second, it is urged that, as Bebout and his wife were forced under the threat of immediate prosecution to convey to the company their house and lot, this conveyance should be set aside. For appellees, on their cross appeal, it is urged that the execution of the deed and the notes and the transfer of the stock evidenced one contract and agreement or understanding; that either they were the free and voluntary acts of Bebout, or else he was forced to sign them; that they are entitled to have the trade upheld in its entirety or else it should be set aside as having been procured by means not countenanced by the law.

Disposing first of the question of the privy examination of the wife, the evidence shows that this acknowledgment was taken in a storeroom. Bebout wrote the deed himself and he and his wife took it to Allcott's storeroom. He had previously signed it. A young lady who was a notary was called upon to take their acknowledgment. Mr. Alcott testified that after Bebout acknowledged the deed he walked with him toward the other end of the store, and while they were some distance away from the notary and Mrs. Bebout, her acknowledgment was taken. As opposed to his testimony Bebout and his

wife say that he was present when her acknowledgment was taken. The certificate of the officer shows that it was acknowledged in due form, and in such case, as was expressly held in Cox v. Gill, 83 Ky., 669:

"Parties will not be permitted to show under the allegation of a mistake that the certificate was not in the form of or as required by law, or that the clerk was out of the county when he took the acknowledgment. When the certificate is regular and proper on its face, and admitted to be signed, and the deed acknowledged before one authorized to take the acknowledgment, what the clerk states as to when it was acknowledged, and the manner of acknowledgment, can not be assailed on the idea that the clerk has made a mistake, and parol proof allowed to contradict the legal effect of the certificate by showing that the clerk certifying took the acknowledgment somewhere else, or that the husband was present when the deed was acknowledged by the wife, or that the clerk failed to read and explain the contents of the deed to her."

The principle announced in this case was approved in the later case of Tichenor v. Yankee, 89 Ky., 508, in which the court says:

"Undoubtedly, the officer may sometimes fail to fully discharge his duty, but the desired stability of title to real estate, and the protection of purchasers and the public, demanded the adoption of the statute.

Individual hardships will occasionally result from the enforcement of any law, however salutary, and it would be exceedingly hazardous, as well as productive of much litigation, to permit the validity of such conveyances to depend upon parol evidence as to their due execution. If the certificate may be thus questioned as to whether the officer has done his duty, then the future vendee, however remote, has no protection. This court construed this statute in the case of Cox v. Gill, 83 Ky., 669, and it was there held that the Legislature, in providing that the certificate of an officer might be called in question for a mistake on his part, did not apply to the form or manner of acknowledgment of a deed of a married woman. If made before a proper officer, then his certificate as to when and how it was acknowledged can not be assailed by parol testimony contradicting it, and showing that it was elsewhere acknowledged, or that the husband was present, or that the clerk failed to explain it to the wife. By virtue of the statute, it can not

be shown that the officer failed to do what his certificate imports. The law intended to give to it, to the extent indicated, absolute verity; otherwise, no confidence can be placed in the record of conveyance.''

Again, in the case of Keith, et al. v. Feder, Silberg & Cole, 16 Rep., 588, this same principle was recognized in the following language:

''Under the provision of section 17, chapter 81, General Statutes, 'no fact officially stated by an officer in respect of a matter about which he is required by law to make a statement in writing, either in the form of a certificate, return or otherwise, shall be called in question, except upon the allegation of fraud in the party benefitted thereby, or mistake on the part of the officer, unless in a direct proceeding against the officer or his sureties.'

''This provision has been interpreted by this court in a number of cases, and the decisions are uniform in holding that the certificate of the officer can not be contradicted by parol evidence.

''It is of immeasurable importance that protection should be given to purchasers in the transmission of title to realty. If the details of the manner in which the officer took acknowledgment of the feme covert can be inquired into and its validity questioned and the certificate destroyed by parol evidence proving there was not a privy examination, or that he did not explain the contents and effect of the instrument, it would make doubtful and insecure the titles to a vast amount of realty. It would invite litigation, destroy the confidence in the verity of the records of conveyances of realty and rob innocent purchasers. It would be opening a rich mine of fraud and perjury. It would produce a feeling of insecurity and unsafety in many peaceful and happy homes in the country.''

Under these authorities, it is apparent that the effort on the part of appellants to attack the validity of the conveyance on the part of Mrs. Bebout upon the ground that she was not subjected to a privy examination is of no avail, and the chancellor correctly held that she was bound by the acknowledgment, and her interest in the title to the property passed.

This leaves for our consideration the larger and controlling question in the case, to-wit, were the deed and notes procured by the appellees through fear brought about by a threat on their part to institute criminal proceedings against Bebout in the event he did not

make them? This is purely a question of fact. The only parties directly cognizant of what passed between them are the three directors on the one side and Bebout himself on the other. He says that they told him he would be prosecuted and put in the penitentiary for from two to ten years in the event he did not make reparation as far as possible by conveying to them his house and lot, transfer to them his stock, and execute his notes for the balance; that only under the fear of immediate prosecution was he induced to enter into this arrangement. On the other hand, they state they knew nothing of the condition in which he had the company's affairs until he voluntarily disclosed it to them; that under the statement made he acknowledged an indebtedness to the company in the sum of $7,649.96. Naturally they were chagrined and disappointed over the condition in which they found the affairs of the company, and called upon him for an explanation. He voluntarily admitted that he had done wrong and had purposely falsified the records of the company in order to mislead and deceive them; that to right the wrong as far as possible he had transferred to his own account, or charged himself with, the sum which he alleged adjusted the matter between himself and the company. They accepted his own figures as the basis upon which they made their settlement, and, accepting the valuations which he placed upon his property and which they placed upon the shares of stock, and to which he evidently at the time agreed, the notes show that the adjustment was made upon that basis. It is in testimony, and undisputed in the record, that since the date of the execution of the notes and the transfer of the property, further examination into the affairs of the company has disclosed, not only startling irregularities in the conduct of the business, but a shortage on the part of Bebout amounting to several thousand dollars. In his cash account alone there is a shortage of more than $2,800; that is, he has charged himself with cash received in a sum in excess of $2,800 above what he has paid out. The suspense account likewise shows a shortage of more than $900. Appellant admits having falsified the books as to the inventories, the sales, and in other particulars, and, with the books in this condition, it is, of course, impossible to tell the extent of his shortage to the company. According to his books the B. G. Billings Printing Co. owed about $1,900, and it has since been developed, not only that this company owed his firm nothing whatever, but

that it held an evidence of indebtedness on the part of the Old Kentucky Manufacturing Co. for about $400. A firm in which appellant's brother was interested likewise presented for payment an evidence of indebtedness which is not shown by the books. Appellees have no means of showing the exact indebtedness on the part of appellant; but since he voluntarily admitted it to be $7,649.96, and charged himself therewith before presenting the statement to his associates, they had a right to rely upon this statement and to hold and claim that he was indebted to them in this amount. Although he testified in this case and denied any indebtedness whatever, he failed to show wherein the figures presented by appellees were wrong, or that they had made any mistake in the calculation . made by them. His own testimony condemns him. He admits, to use his language, that he juggled the figures for the purpose of deceiving his associates, that he padded the inventories and the sales accounts, and kept books in such a manner as to purposely mislead and deceive anyone unfamiliar with his peculiar methods of bookkeeping. His testimony is entitled to no consideration when weighed and compared with the testimony of appellees, who appear to be honest, capable and truthful men. Having admitted that he falsified the record for the purpose of deceiving his associates in order that he might encourage them to put more money into the business and continue him as its head and manager at a salary satisfactory to himself, it would be a matter of small surprise if now, when confronted with his wrongdoing, he should attempt to excuse himself, and, by again juggling the figures, seek to confuse the court as to the real condition of the company's affairs. We have given but little heed to his explanation of the tangled condition of the affairs and the books of this company for the reason that his explanations do not explain.

He says he was coerced into making the settlement which he did. They say that he was not. He introduced his brother and brother-in-law, and some circumstances which, it is claimed for him, corroborated his testimony, to the effect that he was coerced or forced into making this settlement. When these statements which the witnesses say the appellees made are viewed and weighed in the light of the attendant circumstances, there is nothing in them that conflicts in the slightest degree with appellee's testimony to the effect that the settlement and adjustment of appellant's differences with the company

were voluntarily made on his part.  Appellees, according to the testimony, which is not disputed, were careful to state their position fully, fairly and freely to appellant; and while they notified him that he had violated the law and done wrong, they assured him that they would not take the initiative looking toward his punishment, as that would do them no good; although they told him at the same time that they would do nothing to shield him in the event a prosecution was set on foot.  From all the testimony, we are satisfied this settlement was made as appellees say it was, freely and voluntarily so far as appellants were concerned.  In consideration of having his debt to the company cancelled he agreed to deed them his house and lot, transfer to them his stock, and execute the two notes which he did; and they obligated themselves to pay off the $4,500 which he owed upon this stock, and for which it was pledged.  The evidence shows that they have paid this indebtedness and complied fully with their part of the contract.

The chancellor correctly held the deed valid and that appellees were, by the assignment of the stock, invested with the title thereto.  He erred in holding, however, that the two notes which were executed by appellant to appellees and the company were without consideration.  The judgment upon the original appeal is affirmed, and upon the cross appeal it is reversed, with instructions to the chancellor to enter a judgment setting aside the cancellation of these two notes.