KELLEY v. CARTER.

4-9040                                    226 S. W. 2d 53

Opinion delivered January 23, 1950.

*Melvin T. Chambers,* for appellant.

*Wade Kitchens* and *W. H. Kitchens, Jr.,* for appellee.

GRIFFIN SMITH, Chief Justice. Sarah Kelley, a Negress 70 years of age, signed and acknowledged a deed to real property and one of the grantees received it in her

presence. The Chancellor found that the grantor's acts were induced by unreasonable importunities of step-children who would profit by the conveyance. Sarah suffered from advanced cancer; and, as the Court found, she was in excruciating pain when spokesmen for the grantees "worried her" into signing.

Sarah had been married to Walter Kelley seventeen years when he died in 1944. Each had children by a former spouse: Walter eleven, Sarah eight.[1] Prior to 1927 Walter had contracted with W. W. Sorrels for the purchase of eighty acres of relatively poor land. The last of his series of notes for $894.20 matured in November, 1924. Minerals were excepted.

Appellants contend that their father's inability to meet the installments, or to pay taxes, resulted in a request for assistance. Roy Kelley, living in Chicago, took the lead in acting for his brothers and sisters, and in consequence of his personal call on Sorrels in Columbia County additional time was procured. A number of the children joined their father in a new note and advanced $50 for the first payment.

Roy Kelley testified that Mrs. Sorrels took certain mineral rights to cover the difference between $50 and the balance of $150 constituting the cash payment. His father, Roy said, went to F. W. Souder, purchaser of timber, "and he paid off the $100 and the papers were released to him."

Souder testified that he bought timber from Walter Kelley. Sorrels had a note against the land "with a whole string of names on it—a number of the Kelleys." Souder, without initial objection, was permitted to testify that Sorrels told him he had made a deed to the land in Walter's favor, and that it was held in escrow by a bank. The Kelley heirs, Souder said, had assisted their father in buying the land, but the timber accounted for "quite a bit" of the purchase money. A note executed by the Kelleys had been given Souder by Sorrels after

---

[1] Ollie Sharp, one of Sarah's sons, declined to participate in the controversy.

the timber had been taken, and Souder, in turn, gave the note to W. H. Kitchens.[2] Attached to it was a sheet of paper containing names. The sheet had been removed when Souder was questioned in court.

The $50 payment mentioned by Roy Kelley is probably the item of $53 discussed by counsel for appellants, who says that an indorsement on the note accounts for the credit, and that it lends substance to what Roy's understanding was.

The record shows that two deeds were made by Sorrels and his wife. The first, executed and acknowledged August 2, 1940, conveys to Walter B. and Sarah Kelley. It was filed for record Feb. 10, 1945. The second deed is dated Dec. 3, 1945, and was acknowledged the same day. It conveys the land to Sarah and her heirs.

The 1940 deed was acknowledged before George W. Sorrels, a Notary Public. The indorsement shows that Sorrels' commission ran until April 16, 1947. It is insisted that the deed could not have been acknowledged in 1940 by one holding a commission good until 1947, since appointments are for a term of four years; therefore, say appellants, "it is plain to see that this deed was executed after Walter Kelley had died [in 1944], but was dated August 2, 1940."

The second deed (1945) recites that the instrument executed in 1940 was lost after being placed in escrow, "and the purpose of this deed is to reflect facts as of August 2, 1940."

We agree with appellants that the expiration date in question is an irregularity; and, *prima facie,* it creates a presumption that it was made by a seal adapted to use after the deed was executed. This might have been explained at trial, but the inference was not developed. Official records in the office of the Secretary of State, of which we take judicial notice where the matter is required by law to be recorded, show that George W. Sorrels was a Notary Public by appointment of April 17,

[2] The reference relating to delivery of the note was seemingly to W. H. Kitchens, Jr., although the identity is not clear.

1939, and qualified nine days later. He was again appointed to a four-year term[3] April 17, 1943, and qualified April 23. The 1939 appointment expired when Sorrels qualified under the new appointment in 1943, so an acknowledgment taken in 1940 would normally show that the commission expired in 1943 instead of 1947.

Appellant cannot prevail because of this irregularity. While the law requires that expiration date of the commission be shown, the statute is directory, a proviso being that no acknowledgment shall be held invalid for failure to comply with the mandate. Ark. Stats., § 12-1406. Nor is the fact that the 1940 deed was not filed until February 10, 1945, of more significance than to add weight to appellants' suspicion that the instrument was actually prepared after Kelley died. This was another matter in respect of which the trial court would have been receptive to proof—something that conjecture will not supply on appeal.

Treating the first deed as valid, it created an estate by the entirety, with the fee vesting in Sarah as survivor. The second deed was no more than expressions by Sorrels and his wife affirming execution of the first deed and acknowledging that payment had been made.

This brings us to a consideration of the deed from Sarah to appellants, and requires a determination of its validity. Here the testimony is so sharply in conflict, and self-interest is so obvious, that the result must turn largely upon admissions against interest, physical facts, and the testimony of third persons.

On the physical side it is conclusively shown that Sarah was dying of cancer. She signed the deed a few days more than two months before passing away Oct. 24, 1947. Acknowledgment was by C. T. Owen, who was admittedly procured by two of the Kelley brothers. When Owen consented to go to Sarah's home, he did not know how ill she was. He later realized the seriousness of her condition, and in testifying said that he would not want his own mother to transact business in similar circum-

---

[3] Arkansas Statutes Annotated (1947), § 12-1401.

stances, nor would he have gone with the Kelley boys had the full picture been before him.

Sarah told Owen—he had known her most of her life —that she was in misery, and asked if she must sign the deed. He told her his function was that of a notary, and declined to give advice. The Kelleys who were present told Sarah she had received all of the personal property and had been living on the place for several years. They "felt like" she ought to give them a deed. Some discussions, spoken of by Owen as a little argument, occurred before the deed was signed. When the Kelleys told Sarah she [and *her* children] had gotten all of the personal property, Sarah said, "If we did get it we paid for ·it; and the land, I paid for it myself." Interpolating, one of the boys said, "Yes, but somebody helped you, didn't they?" and Sarah replied, "If you will go on and let me alone I will give you a deed to it if you will pay me back what I have been out." The witness added that Sarah did not say what amount she had spent, but when she expressed this willingness to act, Owen took her hand and guided it while the signature was affixed—"for she couldn't write very well."

C. Z. Couch, merchant, identified a mortgage given by Walter and Sarah in April, 1941, covering the realty and some personal property, including live stock. It secured $400 for supplies, such as groceries, etc. After Walter died, $195.36 was paid in discharge of the obligation as it then stood. Appellees insist that they gave their mother the money she used in retiring the mortgage.[4]

There was ample evidence, including the testimony of an attending physician, that Sarah suffered intense and continuous pain before and after August. Drugs were sometimes administered; bleeding was profuse. Some witnesses thought Sarah was wholly incompetent,

---

[4] In 1938 the Columbia Chancery Court, in an action by W. W. Sorrels and his wife against Walter Kelley, quieted Sorrels' title to the land, subject to Kelley's right to pay $216 before Dec. 31 of that year and take the property. In 1946 the Chancery Court set aside a state tax deed to the property, finding that on that record Sarah was the owner.

others had not observed any impairment. On the single issue of mental incapacity we would not hold with appellees, but when the entire transaction is considered it is readily seen that appellants did not, when the deed was delivered or procured,[5] or at any time after Sarah's death, meet the condition mentioned by her: repayment of what she had spent. The most satisfactory evidence of this was the testimony of Couch that the merchandising debt discharged after Walter's death was $195.36. Roy Kelley insisted that he "gave" Sarah twelve dollars about the time the deed was signed, but he did not say it was a part of the obligation impliedly assumed. On the contrary, he denied any promise by asserting that the deed was voluntarily executed.

Affirmed.

---

[5] The word "delivered" is not used in a legal sense.